# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL N. SMETZER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 1:10-CV-93 |
| | ) |
| LARRY R. NEWTON, JR., individually | ) |
| and in his official capacity as Sheriff of | ) |
| Jay County, and NATHAN R. KEEVER, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Michael Smetzer contends in this lawsuit filed on March 31, 2010, that while he was an inmate in the Jay County Jail, the Defendants deliberately ignored his serious dental condition from March 20 to April 1, 2008, which at some point during that time spiraled into a life-threatening illness.[1] He advances claims pursuant to 42 U.S.C. § 1983 under the Eighth and Fourteenth Amendments against Jay County Sheriff Larry Newton, both individually and in his official capacity, and Sergeant Nathan Keever, a jail officer.[2]

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331.  Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (Docket # 24.)

[2] Smetzer also named Keever "in his official capacity as Jail Commander of the Jay County Security Center," but Keever was not named jail commander until the end of 2008. (Keever Dep. 17.)  James Ward was jail commander during the relevant period, but did not work between March 23 and April 2, 2008. (Newton Dep. 10; Keever Aff. ¶ 1; Ward Dep. 9-10.)  In any event, Smetzer already has an official capacity claim by naming Newton as the Sheriff of Jay County.

Smetzer also advanced this suit against Jane Doe and Joe Doe, unknown sheriff deputies of the Jay County Sheriff's Department.  Smetzer, however, does not oppose Defendants' assertion that the Doe Defendants should be dismissed as the deadline to amend the complaint to add a named defendant expired long ago, and besides, the statute of limitations has run and any attempt to add them now by name would be futile.  Accordingly, the Doe Defendants will be dismissed. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) ("We have long refused to consider arguments that were not presented to the district court in response to summary judgment motions." (citation omitted)); *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996) (collecting

Now before the Court is a motion for summary judgment filed by the Defendants on all of Smetzer's claims. (Docket # 88.)  For the following reasons, the motion will be GRANTED with respect to all claims other than Smetzer's Eighth Amendment claim against Sheriff Newton in his individual capacity from his conduct on April 1, 2008, which must go forward to trial.

## I.  FACTUAL BACKGROUND[3]

Newton became the Sheriff of Jay County, Indiana, in 2007. (Newton Dep. 4, 11.) Keever was a jail officer with the rank of sergeant at the Jay County Jail while Smetzer was there as an inmate; Keever's duties included ordering and refilling inmate medications, forwarding requests by inmates to see the doctor to the jail commander or sheriff, faxing inmate medical requests to the jail doctor, and ensuring that the doctor's instructions relating to any inmate were carried out. (Keever Dep. 21-22; Keever Aff. ¶ 1.)  He had successfully completed the jail officers' training course approved by the Indiana Law Enforcement Academy. (Keever Aff. ¶ 3.) When he was not working at the Jail, Keever served as a reserve deputy sheriff, providing security at the Jay County Hospital. (Keever Aff. ¶ 2.)

Sheriff Newton had an agreement with Mark Haggenjos, D.O., to provide medical services to prisoners at the Jay County Jail. (Newton Aff. ¶ 4; Haggenjos Aff. ¶ 1.)  Dr. Haggenjos has over twenty years of experience working as a staff physician in emergency departments and is certified in Advanced Trauma Life Support and Advanced Cardiac Life Support. (Haggenjos Aff. ¶ 3.)  His job as jail doctor was to provide inmate examinations on an as-needed basis, write prescriptions, provide telephone triage for certain conditions, and review

_____

cases).

[3] For summary judgment purposes, the facts are recited in the light most favorable to Smetzer, the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

the medications that inmates were on when admitted to the jail. (Haggenjos Dep. 17.)  Dr. Haggenjos also trained jailers in first aid, taking vital signs, medical screening and symptom recognition, and the dispensing of medicines.[4] (Newton Dep. 38, 40; Keever Dep. 9-10, 13-15, 47; Haggenjos Dep. 23-25, 45-46, 68-69; Boyd Dep. 19-27; Newton Aff. Ex. 2.)  This included training on how to observe an inmate's ability to breathe, eat, swallow, and converse for the purpose of discerning whether an emergency existed. (Haggenjos Dep. 116-17.)  Full-time jailers were also trained through the Indiana Law Enforcement Academy's prescribed course for jail officers. (Newton Aff. ¶ 7, Ex. 2.)

An inmate could request medical care by completing a form obtained from a jailer; the jailer then faxed the completed forms to the doctor on a daily basis. (Newton Dep. 32-37; Keever Dep. 21-22.)  Dr. Haggenjos came to the Jail once a week on Wednesdays to review prisoner medical complaints. (Newton Aff. ¶ 4; Newton Dep. 32-37.)  A jailer could also call or fax Dr. Haggenjos directly at any time at his office or home (Haggenjos Dep. 19-21, 102-03; Newton Dep. 32-37), although several jailers stated that they were supposed to check with their supervisor or Sheriff Newton before doing so (Scholer Dep. 61; Griffith Dep. 33; Eyink Dep. 30-31).  After Dr. Haggenjos received initial information, he advised whether an appointment for the inmate should be set at his regularly-scheduled Wednesday visit or whether the inmate should be transported to his office or the emergency room. (Haggenjos Dep. 21-22; Newton Dep. 37.)  Most inmate dental care was referred to Dr. Mark Tatman, who was paid on a per-prisoner basis. (Newton Aff. ¶ 5.)

---

[4] For example, medications were dispensed to inmates one pill at a time and were logged. (Keever Dep. 13-15; Haggenjos Dep. 45, 68-69.)  If an inmate attempted to "cheek" or secrete the pill, the jailer was to make sure the inmate took it, and if the inmate tried to hide it again, the jailer would take the pill back. (Keever Dep. 14-15; Haggenjos Dep. 45, 69.)

The Jail maintained an operations manual setting out policies and procedures for running the Jail. (Newton Dep. 12-44; Newton Aff. ¶ 6, Ex. 2.)  And jailers were to make a computer entry for all activities during their shift, such as when an inmate is disciplined, gets mail or visitors, receives meals, is dispensed medication, or is transported in or out of the jail. (Scholer Dep. 26; Griffith Dep. 16; Newton Dep. 21-27.)  Although the Jail had a written policy addressing an injury or death of an inmate, it did not have a specific written policy addressing the provision of emergency medical or dental care. (Newton Dep. 30; Newton Aff. Ex. 2.)  Dr. Haggenjos has never received instructions or directives from Sheriff Newton, Keever, or any other jailer seeking to limit an inmate's care based on cost or any other factor. (Haggenjos Dep. 106-07.)

### A.  Thursday, March 20, 2008

Smetzer started experiencing pain in his lower right wisdom tooth sometime between March 6 and March 13, 2008, but hoped that the pain would go away on its own. (Smetzer Dep. 72, 78.)  When it did not, he began complaining to various jailers, including Sergeant Keever, on or about March 13 that his "tooth was hurting and it needed [to be] pulled." (Smetzer Dep. 73, 77.)  On March 20, at approximately 8:30 p.m., Smetzer turned in a medical request form to the jailers, indicating that he had an "abscess" on one of his back teeth and wanted it pulled.[5] (Smetzer Dep. 70-73, 76-77, Ex. 7; Slagle Dep. 13; Sargent Dep. 15, 18.)

Two or three days after Smetzer turned in the request, Sheriff Newton told him that they were having problems getting an appointment with the dentist, Dr. Tatman. (Smetzer Dep. 74-75, 83-84.)  Newton also told Smetzer that it was a breach of security to let him know when he

---

[5] Apparently, Smetzer had just been sentenced and was awaiting transport to the Indiana Department of Corrections. (Smetzer Dep. 71-72, Ex. 1.)

was going to the doctor. (Smetzer Dep. 74-75, 83-84.)

Eventually, an appointment was set for Smetzer to see Dr. Tatman on Tuesday, March 25, 2008, at 2:45 p.m. (Keever Dep. 23-24; Keever Aff. ¶ 4; Tatman Dep. 29, Ex. 8.)  For some reason, however, the Jail failed to take Smetzer to that appointment, and Keever then rescheduled it for two days later. (Keever Dep. 23-24; Keever Aff. ¶ 4; Tatman Dep. 29, Ex. 8.)

### B.  Thursday, March 27, 2008

On Thursday, March 27, 2008, one week after Smetzer had submitted his medical request, Sergeant Keever transported Smetzer to Dr. Tatman's office, and, after an x-ray, Dr. Tatman extracted Smetzer's lower right wisdom tooth. (Tatman Dep. 28-29; Smetzer Dep. 84; Keever Aff. ¶ 5.)  The decayed tooth did not appear to be infected or abscessed, and Dr. Tatman considered it a "pretty routine" procedure. (Tatman Dep. 37-38.)  Smetzer, however, remembers that Dr. Tatman did not administer anesthetic or medication before pulling the tooth. (Smetzer Dep. 90.)  In any event, after the extraction Dr. Tatman instructed Smetzer to use ice and ibuprofen, but did not prescribe any medication or discuss a follow-up visit. (Tatman Dep. 46-47, 91-92, 94; Keever Aff. ¶ 5.)

After Smetzer's return to the Jail, he was given ice and ibuprofen by the jailers upon request. (Smetzer Dep. 97-98.)  The swelling, however, which had started about a week before the extraction, immediately worsened after the tooth was pulled, and Smetzer began to have trouble swallowing. (Smetzer Dep. 95-97; Delporte Dep. 38.)

### C.  Friday, March 28, 2008

By Friday, March 28, the day after his tooth extraction, Smetzer's swelling had spread from his face to his neck and tongue. (Slagle Dep. 34-35.)  His jaw was visibly swollen and

5

looked like someone had punched him. (Delporte Dep. 17.)  He was in so much pain that he was crying and felt so sick that he had trouble getting out of bed. (Slagle Dep. 20; Delporte Dep. 17.) He was unable to eat because of the pain and difficulty swallowing, so his cell mate, inmate Shane Slagle, ate his meals. (Slagle Dep. 20-21; Young Dep. 16.)  He also began to sleep all day and night. (Young Dep. 17.)

Smetzer complained to either Keever or jailer James Eyink about the swelling and requested treatment. (Delporte Dep. 18.)  The officer, whoever it was, responded that Smetzer could not receive treatment and that the swelling was normal. (Delporte Dep. 18.)  Smetzer also asked jailer Roger Boyd if he could go to the emergency room. (Smetzer Dep. 123.)  In addition, another inmate in Smetzer's cell block, Derek Delporte, complained to Keever several times a day about Smetzer's condition. (Delporte Dep. 20.)

### D.  Saturday, March 29, 2008

By Saturday, March 29, the swelling in Smetzer's mouth was so severe that it looked like he was "stuffed with a T-shirt in his mouth his jaw was so big." (Delporte Dep. 20-21; *see* Sargent Dep. 13 (testifying that Smetzer had a "big bulge" on the side of his face).  The swelling from his jaw to his neck resembled a goiter, and he was unable to open his mouth. (Delporte Dep. 28-30.)  He began to spit out pus and felt that he could hardly breathe. (Smetzer Dep. 103, 132, 138-41.)  The jailers allowed Delporte to get Smetzer's meal tray because Smetzer was too ill to get it himself. (Delporte Dep. 21.)  Smetzer, however, could not eat or drink due to the pain and swelling. (Smetzer Dep. 138-40.)

Smetzer tried to get help and made requests to various jailers, including Keever. (Smetzer Dep. 104-05.)  He complained constantly about the pain associated with his tooth and also stated

6

that he could not eat. (Sargent Dep. 13, 16-17.)  One of his cell-block mates, Esteban Sargent, recalled that Smetzer complained to Sheriff Newton about the swelling and difficulty eating and, in response, Newton said to "turn in medical requests." (Sargent Dep. 18-19, 35.)

At 10:08 a.m. on March 29, 2008, Keever was called back to Smetzer's cell; he gave Smetzer ice and Ibuprofen and called Dr. Frankenfield, a physician in Dr. Haggenjos's office. (Keever Dep. 53-54.)  Dr. Frankenfield instructed Keever to take Smetzer to the emergency room. (Keever Dep. 54, Ex. 13 at 16.)  While Keever was getting Smetzer ready to transport, Sheriff Newton spoke with Smetzer at the booking station, and Keever then relayed his conversation with Dr. Frankenfield. (Newton Dep. 47-50.)  Newton responded that since Smetzer had a dental-related issue that had been treated by Dr. Tatman, Keever should first call the dentist. (Keever Dep. 62-63; Newton Dep. 47; Newton Aff. ¶ 9.)

Accordingly, the Jail called Dr. Tatman at his home that Saturday morning about Smetzer's swelling, and Keever then transported Smetzer to Dr. Tatman's office at approximately 11:45 a.m. (Tatman Dep. 30-31; Keever Dep. 53, 55.)  Upon examination, Dr. Tatman observed that Smetzer had partial trismus,[6] which is common with a wisdom tooth extraction, and some swelling, but no pus or dry socket. (Tatman Dep. 30-31.)  He did not note that Smetzer had any trouble breathing. (Tatman Dep. 52, 57.)  Dr. Tatman prescribed Cephalexin, an antibiotic, and Vicodin, a pain medication, and instructed that Smetzer use warm salt-water rinses. (Tatman Dep. 30-31.)

Keever called Sheriff Newton after the visit and reported that Dr. Tatman had prescribed Smetzer antibiotics. (Newton Dep. 54.)  Keever promptly had the prescriptions filled; he also

---

[6] Trismus is difficulty opening the mouth. (Haggenjos Dep. 81.)

verbally gave instructions to the Jail staff concerning the warm salt-water rinses but did not make a log entry about them. (Keever Aff. ¶ 6; Keever Dep. 52.)  The jailers then gave Smetzer the Cephalexin and Hydrocodone (an equivalent to Vicodin) three or four times a day. (Smetzer Dep. 109-10, 114, 125-26.)  Smetzer, however, had difficultly swallowing and thus quit taking them, apparently never telling this to anyone at the Jail. (Smetzer Dep. 109-110, 114, 125-26, 139.)  And Smetzer does not recall Dr. Tatman instructing him to use warm salt-water rinses, but he does know he did not receive them. (Smetzer Dep. 124-26.)

Also on March 29, Smetzer's wife, April, visited him at the Jail at 1:30 p.m.[7] (Newton Aff. ¶ 10, Ex. 3.)  Smetzer had told her several days earlier that the Jail was refusing to help his swelling and pain. (April Smetzer Dep. 29.)  She noticed that Smetzer's cheek and neck were swollen, causing him to appear "deformed," and that he was obviously sick and needed treatment. (April Smetzer Dep. 23-24, 36, 55-59.)  That evening, April called the Jail and told someone that Smetzer needed medical help "right now." (April Smetzer Dep. 24-25, 35-37.)

At 8:30 p.m., jailer Bradley Scholer called Sheriff Newton, reporting that Smetzer's tongue and neck were swollen and that he was having trouble breathing and swallowing. (Newton Dep. 52, 62-63; Newton Aff. ¶ 11; Scholar Dep. 45-46; Hibbard Dep 46-47.)  Newton instructed Keever, who was the reserve deputy on duty that night at the Jay County Hospital, to transport Smetzer to the emergency room. (Newton Dep. 52, 54, 62-63; Newton Aff. ¶ 11; Keever Dep. 68.)  Jailer Joe Hibbard logged the transport, indicating that Smetzer complained of

---

[7] The record is unclear about whether April visited the jail on March 29 or April 1, or both.  Her visit was reflected in the jail log as March 29, but she testified that when she called the Jail later that evening, the jailer told her that an ambulance was on the way for Smetzer (an event that likely occurred on April 1). (April Smetzer Dep. 72-73.)  She also testified that she thought Smetzer was admitted to the hospital on the evening of the day she last visited the Jail. (April Smetzer Dep. 57.)  At this point, the precise date of April's visit(s), however, is immaterial to the Court's determination.

difficulty breathing and that he could not swallow; he also observed that Smetzer's tongue and the right side of his neck were swollen. (Scholer Dep. 45-46; Hibbard Dep. 46-47.)

Keever transported Smetzer to the Jay County Hospital. (Keever Dep. 67; Smetzer Dep. 108.) Dr. Charles Coats evaluated Smetzer, noting that he complained of difficulty swallowing and possible throat swelling following a tooth extraction. (Coats Dep. 5, 8-11, Ex. 2.) He found Smetzer alert and in no apparent distress, but with some edema in the neck; otherwise, Smetzer was "totally normal" and had neither respiratory nor cardiac conditions. (Coats Dep. 11.) Dr. Coats found no stridor,[8] trismus, drooling, or breathing difficulty; no swallowing problems or pus in the mouth; and no fever, chills, or malaise. (Coats Dep. 12-14.) He noted that Smetzer's voice was normal. (Coats Dep. 12-14.) Smetzer apparently did complain of pain to Dr. Coats's nurse, but not to Dr. Coats. (Coats Dep. 13-14.) Dr. Coats concluded there was no infection and that Smetzer was having a reaction to swelling or an inflammatory reaction to the tooth extraction (such as when the body reacts to a sprain). (Coats Dep. 17-19.)

Dr. Coats gave Smetzer several injections and told him that it would take a couple of days for the antibiotics to work. (Smetzer Dep. 131-32; Keever Dep. 72-73; Keever Aff. ¶ 9; Coats Dep. 20-21.) He indicated that Smetzer should follow up with his primary care physician in one-to-two days if his condition persisted. (Coats Dep. 22-25, Ex. 2.) Both Smetzer and Keever contend, however, that they were unaware of this instruction, and no jail log entry was made concerning it. (Smetzer Dep. 119; Keever Aff. ¶ 8; Keever Dep. 72-74.) Once back at the Jail, Keever placed Smetzer in the receiving cell for overnight observation. (Keever Dep. 74-75; Scholer Dep. 51; Young Dep. 26.) Keever then informed Sheriff Newton about what had

_____

[8] Stridor is a sound made when one breathes through the mouth. (Haggenjos Dep. 81.)

occurred at the emergency room. (Newton Aff. ¶ 11.)

### E. Sunday, March 30, and Monday, March 31, 2008

Following the emergency room visit, Keever scheduled Smetzer to see Dr. Haggenjos on Wednesday, April 2. (Newton Dep. 73.)  Keever did not receive any complaints from Smetzer on Sunday, March 30, and did not see him at all during his 7:00 a.m. to 3:00 p.m. shift that day. (Keever Aff. ¶ 10; Smetzer Dep. 144.)  And Keever did not work at the Jail during the remaining two days—Monday, March 31, and Tuesday, April 1. (Keever Aff. ¶ 11; Smetzer Dep. 144.)  Sheriff Newton also did not see Smetzer on March 30 or 31. (Newton Aff. ¶ 13.)

On Sunday morning, March 30, Smetzer requested to return to his regular cell, not because his condition improved, but because he thought he would get better care from the other inmates in his cell block than the care he was receiving from the jailers. (Smetzer Dep. 127-29.) He was moved back to his regular cell sometime after noon on March 30. (Newton Aff. ¶ 14.) Smetzer stayed in bed sleeping and moaning most of March 30, 31, and April 1, and was unable to eat or drink; he continued to receive all of his medicines from the jailers, but could not swallow them. (Smetzer Dep. 117, 130, 141, 143-44; Delporte Dep. 24; Young Dep. 21, 31, 46.)

Slagle, Smetzer's cell mate, says that (apparently on or before March 30, 2008) he told Keever that Smetzer needed medical attention, but does not remember the date those conversations took place or what Keever said in response. (Slagle Dep. 27-29.)  He also stated that Sheriff Newton came back to the cell once after he tried to get attention for Smetzer, but again, he cannot recall the date or the content of their conversation. (Slagle Dep. 30.)  Inmate Delporte also recalls talking to a jailer about Smetzer's swelling but is not sure whether it was Keever or Eyink. (Delporte Dep. 18.)  Neither inmate, however, knew that Smetzer saw Dr.

Tatman a second time or that he was ever taken to the emergency room. (Slagle Dep. 23-26, 52; Delporte Dep. 30.)

## F.  Tuesday, April 1, 2008

On Tuesday morning, April 1, 2008, Smetzer woke Slagle; Smetzer was holding his throat and mumbling, and it appeared he could not talk or breathe. (Slagle Dep. 39-40.)  Slagle, alarmed, made noise to get the jailers' attention. (Slagle Dep. 83.)

At 5:45 a.m., jailer Kenneth Griffith was called to Smetzer's cell, and Smetzer reported having trouble breathing. (Griffith Dep. 25-27.)  Griffith saw no neck or throat swelling, but he called Sheriff Newton, told him that Smetzer was having trouble breathing, and Newton instructed him to call Dr. Haggenjos. (Griffith Dep. 26-28, 32; Newton Dep. 68-69.)  Dr. Haggenjos told Griffith to keep an eye on Smetzer and if he was not better by 7:00 a.m. to take him to the hospital. (Griffith Dep. 25.)  Griffith called Sheriff Newton back and conveyed Dr. Haggenjos's instructions. (Griffith Dep. 29.)  Griffith then returned to his duties, but moved Smetzer to the receiving cell to watch him more closely and kept checking on him. (Griffith Dep. 28; Newton Dep. 69-70.)  Griffith's shift ended at 7:00 a.m., and he relayed Smetzer's situation to the next shift. (Griffith Dep. 29-30.)

At about 11:00 a.m., Smetzer saw Sheriff Newton and told him about increased swelling, "excruciating pain," and that he needed medical attention. (Smetzer Dep. 148; Newton Dep. 70-72; Newton Aff. ¶ 15.)  Newton then purportedly responded that Smetzer was "costing the County too much money" and that he would not receive any more medical attention until he was transferred to the Department of Corrections.[9] (Smetzer Dep. 144-45, 151; Slagle Dep. 31-33.).

_____

[9] Newton claims, however, that he did not perceive any need for immediate medical care; in fact, although Smetzer had problems swallowing, he spoke normally, claimed to be "doing okay," and seemed to have no

That evening, inmate Matthew Young felt Smetzer's head and noted that it was "burning hot." (Young Dep. 12, 15.)  He also saw red and purple marks on Smetzer's throat and thought because of the swelling  that he "looked like a bullfrog." (Young Dep. 12, 15.)  Young yelled for help. (Young Dep. 15.)  Jailer Ledbetter responded and removed Smetzer from the cell block. (Young Dep. 15.)  At 6:51 p.m., jailer Boyd observed that Smetzer's throat had become more swollen than before—now a little bigger than a golf ball—and that he was having trouble speaking and breathing. (Boyd Dep. 42-44.)  Boyd called Dr. Haggenjos, who told him to let Sheriff Newton know and to either transport Smetzer to the emergency room or to call the emergency medical technicians ("EMTs"). (Boyd Dep. 42.)  Boyd called Sheriff Newton, who was not in, and then the EMTs, who arrived at 6:55 p.m. (Boyd Dep. 42-46; Newton Dep. 75.)  The EMTs indicated that Smetzer needed to go to the emergency room quickly. (Smetzer Dep. 153, 159-61.)  Boyd signed a paper declining the use of the EMTs to transport Smetzer and said that he needed to call Sheriff Newton. (Smetzer Dep. 153; Boyd Dep. 45.)  Smetzer, however, emphasized that he needed to go immediately because he could not breathe, and at 7:00 p.m.—five minutes after the EMTs arrived and nine minutes after Boyd made his initial observations—Smetzer was on his way to the Jay County Hospital (a ten-minute trip) in the back of jailer Ledbetter's car. (Boyd Dep 45-48; Smetzer Dep. 153-55; Keever Dep. 71.)  When Sheriff Newton learned that Smetzer had gone to the hospital, he also went there. (Newton Dep. 76.)

---

difficultly breathing. (Newton Aff. ¶ 15; Newton Dep. 70-72.)  Newton knew that Smetzer was scheduled to see Dr. Haggenjos the next day and reminded Smetzer that Dr. Coats said it would take time for the infection to diminish. (Newton Aff. ¶ 15; Newton Dep. 72.)

Upon examination at the hospital, Dr. James Robinson found that Smetzer's vitals were abnormal, he exhibited trismus and strider, his neck was red and hot, and his lymph nodes were swollen. (Robinson Dep. 21-22.)  In addition, Smetzer's tonsils were swollen and exuding pus, and his uvula was pushed to the side. (Robinson Dep. 22.)  Dr. Robinson ordered a scan of Smetzer's neck, which showed extensive soft tissue swelling, multiple loculated abscesses, and that his airway was displaced to the left. (Robinson Dep. 23-25; Hornaday Aff. Ex. 5.)  He diagnosed Smetzer with Ludwig's angina, an immediately life-threatening condition that typically starts after a dental procedure;[10] Dr. Robinson knew that "time was of the essence" and that Smetzer needed specialized care. (Robinson Dep. 24-25, 49, 88.)

After Sheriff Newton contacted the Department of Corrections for approval on where Smetzer could be sent, Smetzer was transported by ground ambulance to Wishard Hospital. (Newton Dep. 77-78; Newton Aff. ¶ 19; Robinson Dep. 92.)  He underwent immediate surgery in the early hours of Wednesday, April 2, and was placed in the intensive care unit. (Robinson Dep. 27, 58; Newton Dep. 76; Newton Aff. ¶ 19; Hornaday Aff. Ex. 2.)     At approximately 10:00 p.m. on April 1, 2008, jailer Boyd executed a jail log entry confirming Smetzer's transfer to the Indiana Department of Corrections. (Boyd Dep. 53-55, Ex. 19.)

## II.  STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P 56(a); *Payne*, 337 F.3d at 770.  A genuine issue of material fact exists "if the evidence is such

---

[10] More specifically, Ludwig's angina is acute cellulitis of the soft tissues below the mouth, with symptoms including pain, dysphagia, and potentially fatal airway obstruction.  The condition can cause airway obstruction within hours, and maintaining the airway is of the highest priority.  Treatment includes airway management, surgical drainage, and intravenous antibiotics. THE MERCK MANUAL 824-25 (Mark H. Beers, ed., 18th ed. 2006).

that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005).

When ruling on a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne*, 337 F.3d at 770.  The only task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).  If the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party, summary judgment may not be granted. *Payne*, 337 F.3d at 770.

A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true," as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771; *Scott v. Harris*, 550 U.S. 372, 380 (2007) (instructing that in determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts" (citation and internal quotation marks omitted)).

### III.  APPLICABLE LAW

In order to recover damages from an individual under § 1983, a plaintiff must establish that the defendant "was personally responsible for the deprivation of a constitutional right." *Knight v. Wiseman*, 590 F.3d 458, 462-63 (7th Cir. 2009).  "To be personally responsible, an

14

official 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Id.* (quoting *Johnson v. Snyder*, 444 F.3d 579, 583 (7th Cir. 2006)).

"The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "Prison officials must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care."[11] *Id.* (citing *Farmer*, 511 U.S. at 834); *accord Holloway*, 2012 WL 5846289, at *7 (quoting *Boyce v. Moore*, 314 F.3d 884, 888-89 (7th Cir. 2002)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 2012 WL 5846289, at *7 (citing *Farmer*, 511 U.S. at 835); *see Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." (citation omitted)); *Knight*, 590 F.3d at 463.

"To succeed on a deliberate indifference claim, a plaintiff must (1) demonstrate that his medical condition is 'objectively, sufficiently serious,' and (2) demonstrate that the defendant acted with a 'sufficiently culpable state of mind.'" *Holloway*, 2012 WL 5846289, at *7 (quoting *Farmer*, 511 U.S. at 834); *accord Boyce*, 314 F.3d at 889. Additionally, where prison officials delayed rather than denied medical assistance to an inmate, a plaintiff must prove that "the delay

---

[11] "[A] prisoner is not entitled to receive 'unqualified access to healthcare.'" *Holloway v. Delaware Cnty. Sheriff*, __ F.3d __, 2012 WL 5846289, at *8 (7th Cir. Nov. 20, 2012) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "Instead, prisoners are entitled only to 'adequate medical care.'" *Id.* (quoting *Johnson v. Doughty,* 433 F.3d 1001, 1013 (7th Cir. 2006)). "Medical malpractice or mere disagreement with a doctor's medical judgment does not constitute deliberate indifference." *Hall-Bey v. Ridley-Turner*, 233 F. App'x 572, 574 (7th Cir. 2007) (unpublished). In any event, "[n]on-medical officials cannot be held liable for reasonably relying on the medical judgment of professionals." *Allen v. Frank*, 246 F. App'x 388, 391 (7th Cir. 2007) (unpublished); *accord Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005).

15

(rather than the inmate's underlying condition) caused some degree of harm," *Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007), or "unreasonably prolonged [his] suffering," *Berry v. Peterman*, 604 F.3d 435, 442 (7th Cir. 2010); *see also Knight*, 590 F.3d at 466.

"A medical need is considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno*, 414 F.3d at 653). "Notably, '[a] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Id*. (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

"To demonstrate that a defendant acted with a 'sufficiently culpable state of mind,' a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk." *Holloway*, 2012 WL 5846289, at *8 (citing *Johnson*, 433 F.3d at 1010). "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Id*. (citing *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1988)); *see Washington v. LaPorte Cnty. Sheriff's Dep't*, 306 F.3d 515, 518 (7th Cir. 2002) (stating that "ordinary negligence by prison officials is not enough to show an Eighth Amendment violation"). That is, "[a]lthough negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care." *Roe*, 631 F.3d at 857. "[I]t is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id*. (quoting *Greeno*, 414 F.3d at 653).

16

## IV.  SMETZER'S INDIVIDUAL CAPACITY CLAIMS FROM CONDUCT
## PRIOR TO MARCH 30, 2008, ARE TIME-BARRED

"[F]ederal courts must apply the state statute of limitations for personal injury actions

when attempting to determine the timeliness of a claim under § 1983." *Dinger v. City of New*

*Albany*, 668 F. Supp. 1216, 1217 (S.D. Ind. 1987) (citation omitted).  Indiana has a two-year

statute of limitations for personal injury actions. IND. CODE § 34-11-2-4.  Accordingly,

Defendants argue that all of Smetzer's claims arising from conduct prior to March 31, 2008, are

barred by the statute of limitations since he did not file this suit until March 31, 2010.

But Smetzer asserts that the "continuing violation" doctrine saves these claims.  The

continuing violation doctrine has been applied to § 1983 suits, *Heard v. Sheahan*, 253 F.3d 316,

319 (7th Cir. 2001), and "allows a complainant to obtain relief for a time-barred act . . . by

linking it with acts that fall within the statutory limitations period," *Filipovic v. K & R Express*

*Sys., Inc.*, 176 F.3d 390, 396 (7th Cir. 1999).  A plaintiff must show that these acts were "related

closely enough" to the acts occurring within the established time frame "to be considered one

ongoing violation." *Id*. (citation omitted).  "Courts will then treat the series of acts as one

continuous act ending within the limitations period." *Id*.

But in claims brought under the Eighth Amendment, "[i]t is the denial of treatment for

[the prisoner's] serious medical need, and not the unfortunate physical consequences of that

failure, that is the basis of the underlying alleged constitutional violation." *Wilson v. Groze*, 800

F. Supp. 2d 949, 956 (N.D. Ill. 2001) (citing *Heard*, 253 F.3d at 318).  Accordingly, in cases

alleging the denial of medical treatment, the Seventh Circuit Court of Appeals has stated that

"[e]very day that [a defendant] prolonged [a prisoner's] agony by not treating his painful

condition marked a fresh infliction of punishment that caused the statute of limitations to start

17

running anew." *Heard*, 253 F.3d at 318-20; *accord Wilson*, 800 F. Supp. 2d at 955.  "[A]n Eighth Amendment violation arising out of a defendant's deliberate indifference to a prisoner's serious medical needs is a continuing violation, and thus can accrue for as long as a defendant knows about a prisoner's serious medical condition, has the power to provide treatment, and yet withholds treatment." *Wilson*, 800 F. Supp. 2d at 955 (citing *Heard*, 253 F.3d at 318).  Stated another way, "[d]eliberate indifference to a serious medical need is a continuing violation that accrues when the defendant has notice of the untreated condition and ends only when treatment is provided or the inmate is released." *Jervis v. Mitcheff*, 258 F. App'x 3, 5-6 (7th Cir. 2007) (unpublished).

To illustrate, in *Wilson*, 800 F. Supp. 2d at 956-57, the plaintiff complained that a prison nurse was deliberately indifferent to his serious medical condition on November 22.  Two days later, November 24, the plaintiff again complained about his problem, was taken to the hospital, and underwent surgery.  Citing *Heard*, 253 F.3d at 318-20, the *Wilson* court concluded that Wilson's Eighth Amendment claims "started to accrue on November 22 and stopped accruing on November 24.  On November 22, Wilson possessed a complete and present cause of action against defendants.  Specifically, he could have stated a cognizable Eighth Amendment claim by alleging that defendants failed to provide him with medical treatment for a serious medical need . . . ." 800 F. Supp. 2d at 956-67.

Therefore, "*Heard* is very clear on the question of when a prisoner's deliberate indifference to serious medical needs accrues: it accrues when he receives treatment or when he is released from the custody of those [who] have been refusing to do something about the condition." *McClary v. Huston*, No. 11-1394, 2012 WL 5354709, at *3 (C.D. Ill. Oct. 29, 2012);

*accord Watkins v. Ghosh*, No. 11 C 1880, 2011 WL 5981006, at *3 (N.D. Ill. Nov. 2, 2011); *see also Lampley v. Mitcheff*, No. 3:08-cv-282, 2009 WL 5322951, at *5 (N.D. Ind. Dec. 28, 2009) (holding that "[a]t the latest, the statute of limitations on a prisoner's deliberate indifference claim runs 'for as long as the defendants had the power to do something about his condition'") (quoting *Heard*, 253 F.3d at 318-20)).

Applying this precedent here, Smetzer's first cause of action arguably started to accrue on March 20, 2008, when he submitted the medical request form, and stopped accruing on March 27, 2008, when he was treated by Dr. Tatman. Accordingly, any claims arising from Smetzer's first alleged cause of action are time-barred since Smetzer did not file this suit until March 31, 2010. Smetzer's second alleged cause of action started to accrue after his tooth was extracted by Dr. Tatman on March 27, 2008, and stopped accruing when he was treated by both Dr. Tatman and the hospital on March 29, 2008, and therefore, they too are time-barred. On this record, the only claims *not* precluded by the statute of limitations are any "continuing violations" that started to accrue on March 30 (which then stopped accruing when Smetzer received care at the hospital on April 1, 2008, followed by his transfer to the custody of the Department of Corrections, *see Jervis*, 258 F. App'x at 5-6), and those that arose from conduct on March 31 or April 1.

"Statute of limitations are designed 'to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'" *Wilson*, 800 F. Supp. 2d at 957 (quoting *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49 (1944)). "Statutes of limitations are not arbitrary obstacles to the vindication of just claims, and therefore they should not be

given a grudging application.  They protect important social interests in certainty, accuracy, and repose." *Id.* (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 452-53 (7th Cir. 1990)).  Accordingly, on this record, all of Smetzer's claims based on Defendants' conduct prior to March 30, 2012, are time-barred under the applicable two-year statute of limitations and thus fail as a matter of law.

### V.  ONLY SMETZER'S INDIVIDUAL CAPACITY CLAIM AGAINST SHERIFF NEWTON FROM CONDUCT ON APRIL 1, 2008, SURVIVES ON THE MERITS

Turning to the merits, Smetzer describes eight purported occasions of a continuing pattern of deliberate indifference, most of which occurred prior to March 30, 2008 and thus barred by the statute of limitations.  But even if they were not time-barred, when viewed in a light most favorable to Smetzer and drawing all reasonable inferences in his favor, *Goelzer v. Sheboygan Cnty.,* 604 F.3d 987, 991 (7th Cir. 2010), only one of the occasions that he describes—Sheriff Newton's conduct on April 1, 2008—could support a finding of deliberate indifference.  The Court will discuss each of the eight occasions that Smetzer cites after addressing the first prong of his deliberate indifference claim: whether he demonstrated an objectively serious medical condition.

#### A.  *Smetzer Demonstrated an Objectively Serious Medical Condition*

To establish deliberate indifference claims against Sergeant Keever and Sheriff Newton in their individual capacities, Smetzer must first show that his tooth problem constituted an objectively serious medical condition. *Holloway*, 2012 WL 5846289, at *8.  Defendants argue that Smetzer's claims fail at the outset because although Keever and Newton both knew that Smetzer had a tooth problem, neither were aware that he had "any life-threatening condition, or potentially life-threatening condition." (Mem. of Law in Supp. of Summ. J. 13.)

20

But Defendants' characterization of an objectively serious medical need is too narrow. "A medical condition need not be life-threatening to qualify as serious and to support a § 1983 claim, providing the denial of medical care could result in further significant injury or in the unnecessary infliction of pain." *Ferguson v. Borgen*, No. 06-c-325, 2007 WL 2789506, at *13 (E.D. Wis. Sept. 24, 2007 ) (citing *Reed v. McBride*, 178 F.3d 849, 852-53 (7th Cir. 1999)).  The Seventh Circuit Court of Appeals has emphasized that "dental care is one of the most important medical needs of inmates." *Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005) (quoting *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001)).  In that vein, it has held that "[t]ooth decay can constitute an objectively serious medical condition because of pain and the risk of infection." *Berry*, 604 F.3d at 440 (citing *Board*, 394 F.3d at 480-83).  "Any person who has spent a night tossing and turning in suffering from an abscessed tooth knows that dental pain can be excruciatingly severe." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Of course, "not all claims regarding improper dental care will be constitutionally cognizable." *Id.*  "Dental conditions, like other medical conditions, may be of varying severity." *Id.*; *compare Dolis v. Loftus*, No. 08-cv-2085, 2011 WL 978916, at *15 (C.D. Ill. Mar. 17, 2011) (concluding that inmate's two cavities, which did not cause him pain, were not serious medical needs), *with Berry*, 604 F.3d at 440 (finding that inmate's tooth decay and pain, requiring an immediate root canal, was an objectively serious medical condition).  "The standard for Eighth Amendment violations contemplates 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Chance*, 143 F.3d at 702 (citation omitted).  "A cognizable claim regarding inadequate dental care, like one involving medical care, can be based on various factors, such as the pain suffered by the plaintiff, the deterioration of the teeth due to a lack of treatment, or the

21

inability to engage in normal activities." *Id*. (citations omitted).

Here, Smetzer complained to various jailers, including Keever, about tooth pain for at least one week before submitting a written request for dental care on March 20, 2008.  The request indicated that he had an "abscess" on a back tooth and "would like to have it pulled." (Smetzer Dep. 70-73, 76-77, Ex. 7.)  On March 27, Dr. Tatman observed that although the tooth was not infected, it was "pretty decayed" and immediately extracted it. (Tatman Dep. 37.) Smetzer states that his swelling and pain promptly increased after the extraction, limiting his ability to eat, drink, and speak.  Accordingly, on this record, Smetzer establishes that at least by March 27th he had an objectively serious medical condition. *See Maddox v. Jones*, 370 F. App'x 716, 719 (7th Cir. 2011) (unpublished) (collecting cases and finding prisoner's argument persuasive that his mouth pain after an attempted wisdom tooth extraction, coupled with potential infection, was a serious medical condition).

### B.  Of Smetzer's Eight Alleged Occasions of Deliberate Indifference, Only One Survives Summary Judgment on the Merits

Sheriff Newton and Sergeant Keever argue that even if Smetzer did demonstrate an objectively serious medical condition, they are entitled to summary judgment on Smetzer's individual capacity claims because they did not act "with a sufficiently culpable state of mind" *Holloway*, 2012 WL 5846289, at *7, and actually provided him with reasonable medical attention.  Smetzer, however, responds by citing to eight purported instances of deliberate indifference, which the Court will now discuss in turn.

1.  <u>That Smetzer Did Not See Dr. Tatman Until Seven Days After He Submitted His Request Form</u>

Smetzer first cites to the five days (from March 20 to March 25) it took Keever to

22

schedule an initial appointment with Dr. Tatman, which eventually fell through, and the two days it took for another one, for a total of seven days delay following the submission of his request form.  He contends that Keever and Newton were deliberately indifferent to his severe pain and serious dental needs by delaying treatment for that long.

"Delay is not a factor that is either always, or never, significant.  Instead the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (articulating that a three-month unexplained delay in obtaining a dental appointment could support a deliberate indifference claim if defendant was aware of the severity of the inmate's pain and dental problems yet refused to approve a dental visit); *Berry*, 604 F.3d at 442 (finding that a one-month delay in referring inmate to a dentist created an issue of material fact about the prison physician's deliberate indifference); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (concluding that a three-week delay in referring inmate to an oral surgeon after observing inmate's swollen and infected mouth, together with knowledge of his pain, could support a finding of deliberate indifference).

But here, Smetzer has failed to produce any evidence that suggests Sheriff Newton or Keever intentionally or even recklessly disregarded or delayed his request to see a dentist. *See Holloway*, 2012 WL 5846289, at *8 (explaining that the subjective prong of deliberate indifference "requires more than negligence and . . . approaches intentional wrongdoing" and compares to "that of criminal recklessness").  Newton told Smetzer several days after he submitted his treatment request that the Jail was "having problems getting an appointment" (Newton Dep. 75), but Keever eventually secured one for March 25.  This appointment was

23

missed for some reason, but was promptly rescheduled for just two days later.  Although his

dental treatment may not have been as immediate as Smetzer would have preferred, "[a]

defendant with knowledge of a risk need not take perfect action or even reasonable action[,] . . .

his action must be reckless before § 1983 liability can be found." *Collins v. Seeman*, 462 F.3d

757, 762 (7th Cir. 2006) (citation and internal quotation marks omitted).

Keever and Newton's conduct in securing Smetzer an appointment within seven days of

receiving his medical request falls short of recklessness.  Significantly, Smetzer at that point had

only complained to the jailers of tooth pain; his later complaints of swelling and difficulty with

eating, breathing, and swallowing did not occur until *after* the tooth extraction on March 27.

And Smetzer seems to ignore the fact that he contributed to the delay by waiting one to two

weeks after the onset of his tooth problem to even submit a medical request form, apparently

thinking that the problem would resolve on its own.

To reiterate, "[t]he deliberate indifference standard imposes a 'high hurdle' for a plaintiff

to overcome." *Id.* (quoting *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)).  The Seventh

Circuit has not "suggest[ed[ that a minor delay in treatment constitutes deliberate indifference."

*Berry*, 604 F.3d at 442; *see Stanbridge v. Mitchell*, No. 10-cv-3008, 2011 WL 5330642, at *6

(C.D. Ill. Nov. 7, 2011) (recognizing that "minimal delays are not actionable").  In fact,

"[a]nyone who has ever visited a doctor's office knows that some delays in treatment are

inevitable, particularly absent a life-threatening emergency.  Such delays are even more likely in

the prison environment." *Berry*, 604 F.3d at 442; *see Stanbridge*, 2011 WL 5330642, at *6

("[D]elays in treating non-emergency conditions can be expected in any dentist's office,

particularly so in Plaintiff's environment.").  On this record, even if Smetzer had timely-filed

24

this cause of action, no reasonably jury could conclude that getting him to the dentist within seven days of his medical request for treatment constituted deliberate indifference by Sheriff Newton or Sergeant Keever.

    2.  <u>That Keever Took Smetzer to Dr. Tatman, Rather Than to the Emergency Room, on the Morning of March 29</u>

Next, Smetzer alleges that Defendants were deliberately indifferent to his serious medical needs during the period immediately following his tooth extraction on March 27, when he complained of increased swelling, severe pain, and difficulty with breathing and eating. Specifically, Smetzer alleges that Newton and Keever were deliberately indifferent when on the morning of March 29, two days after the extraction, Keever took Smetzer to see Dr. Tatman rather than to the emergency room as Dr. Frankenfield instructed.

To review, Keever called Dr. Frankenfield, one of the jail doctors in Dr. Haggenjos's office, on the morning of March 29 concerning Smetzer's complaints of increased swelling, pain, and difficulty with eating and breathing, and Dr. Frankenfield instructed Keever to take Smetzer to the emergency room. While Keever was preparing to do so, Newton spoke with Smetzer and then directed Keever to call Dr. Tatman instead.

Smetzer alleges that Newton and Keever were deliberately indifferent by intentionally disregarding Dr. Frankenfield's instruction to take him to the hospital. Of course, prison officials may not substitute their judgment for that of a medical professional. *Zentmyer v. Kendall Cnty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000). "If a defendant consciously chose to disregard a nurse or doctor's directions in the face of medical risks, then he may well have exhibited the necessary deliberate indifference." *Id.*; *accord Weeks v. Hodges*, __ F. Supp. __,

2012 WL 1669459, at *7 (N.D. Ind. May 10, 2012).

"But deliberate indifference is an onerous standard . . . ." *Zentmyer*, 220 F.3d at 812. Smetzer was not denied medical attention in this instance, as he received care from Dr. Tatman within two hours.  "[T]o be deliberately indifferent the [Defendants] must have *ignored* a risk or have been indifferent to it; it is not enough to have reacted to the risk inadequately or imperfectly." *Taylor v. Washington Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 893 (E.D. Wis. 2006) (emphasis in original).  Sheriff Newton's logic in directing Keever to call Dr. Tatman rather than transporting Keever to the emergency room was reasonable in that Smetzer had a dental problem stemming from the procedure Dr. Tatman had just performed. *See Holloway*, 2012 WL 5846289, at *8 (emphasizing that an inmate is entitled to only "adequate medical care," not "unqualified access to healthcare").

Indeed, even Smetzer's rebuttal expert, Dr. Anthony Hornaday, does not really disagree with Dr. Tatman seeing Smetzer on March 29, but only takes issue with Newton's disregard of Dr. Frankenfield's directive to take Smetzer to the emergency room. (Hornaday Dep. 54-55.) Moreover, Smetzer does not suggest, much less produce evidence of, how Newton's decision to send Smetzer to Dr. Tatman instead of the emergency room resulted in different or inadequate treatment that either worsened his condition or prolonged his pain. *Cf. Weeks*, 2012 WL 1669459, at *9 (explaining that even though a delay in treatment did not worsen the inmate's condition, a deliberate indifference to "prolonged, unnecessary pain can itself be the basis for an Eighth Amendment claim").  Therefore, Smetzer's second purported instance of deliberate indifference is not only time-barred but also fails on the merits.

3.  <u>That the Jail Failed to Provide the Salt-Water Rinses Prescribed by Dr. Tatman</u>

At Smetzer's visit with Dr. Tatman on March 29, Dr. Tatman prescribed an antibiotic and pain medication and instructed that Smetzer rinse the extraction site with warm salt water. Smetzer received both of the prescribed medications from the jailers but alleges that Keever was deliberately indifferent by failing to provide the salt-water rinses.

In so doing, Smetzer reiterates that a prison official is deliberately indifferent if he intentionally interferes with prescribed medical or dental treatment. *See Zentmyer*, 220 F.3d at 812.  But there is no evidence that Keever intentionally or recklessly ignored Dr. Tatman's instructions for the rinses; rather, the record reflects that Keever verbally informed the jailers about the rinses upon Smetzer's return.  Moreover, there is no indication that Keever thought that missing the salt-water rinses would cause Smetzer serious harm. *Id.* at 810.

At most, Keever was perhaps negligent in failing to make a log entry concerning Smetzer's need for the rinses. *Id.* at 812 ("Failure to dispense medication exactly as prescribed may constitute negligence . . . .").  Isolated instances of neglect, however, are not enough to support an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997) ("A finding that a defendant's neglect of a prisoner's condition was an isolated occurrence . . . or an isolated exception . . . to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." (internal quotation marks and citations omitted)). Accordingly, even if not time-barred, Smetzer's failure to receive the salt-water rinses prescribed by Dr. Tatman does not give rise to any inference that Keever was deliberately indifferent to his condition.

4.  <u>That Smetzer Was Taken to the Emergency Room More Than Seven Hours After His Wife's Visit on March 29</u>

Next, Smetzer argues that Sheriff Newton was deliberately indifferent by purportedly waiting more than seven hours after April Smetzer's visit on March 29 to transport him to the emergency room.  This argument fails at the outset.

Smetzer states that after his second visit with Dr. Tatman on the morning of March 29, his condition deteriorated in that his neck swelling made it difficult for him to eat or breathe.  As Smetzer describes it, when his wife, April, visited him at 1:30 p.m. that day, she immediately noticed that he was in severe pain and that his face and neck were red and swollen.  In his response brief, Smetzer claims that April then brought these issues "to Sheriff Newton's attention *during her visit*." (Mem. in Opp'n to Mot. for Summ. J. 9-10 (emphasis added).)  He argues that Newton was deliberately indifferent because despite April's pleas, Newton waited until approximately 10:00 p.m. that night to have Smetzer transported to the emergency room, causing him "needless pain and suffering." (*Id*.)

But Smetzer's argument is at odds with the record and April's actual deposition testimony.  In fact, April testified that Smetzer "called [her] *that night*" saying he needed help. (April Smetzer Dep. 24 (emphasis added); *see also* April Smetzer Dep. 23, 25, 29, 35-37.)  She then described what she did next: "Well, I proceeded to call somebody.  I talked to somebody.  I think it was Newton." (April Smetzer Dep. at 24.)  She admits, however, that she does not know who she spoke with and only believes "it was Newton or somebody in the jail." (April Smetzer Dep. at 29.)

As a result, Smetzer has produced absolutely *no* evidence that April actually talked with

28

Newton or Keever about Smetzer's condition during her March 29 afternoon visit, which rings

the death knell for his argument that Newton intentionally delayed treatment for more than seven

hours. *See generally Liu v. T & H Mach., Inc.*, 191 F.3d 790, 796 (7th Cir. 1999) ("A party must

present more than mere speculation or conjecture to defeat a summary judgment motion.").

And, of course, if she did speak to Newton via telephone sometime that night as she

claims, it is apparent that by 10:00 p.m. that evening Smetzer was on his way to the emergency

room.  There is no showing (aside, perhaps, from speculation) that this apparently brief interval

was the result of either intentional or reckless conduct on the part of Newton. *Holloway*, 2012

WL 5846289, at *8.  Accordingly, since no reasonable jury could conclude from this evidence

and under this scenario that deliberate indifference was at work, this time-barred claim also fails.

5.  <u>That Smetzer Was Transported to the Emergency Room at 9:56 p.m. on March 29,</u>
<u>Rather Than 8:36 p.m.</u>

Smetzer next cites jailer Hibbard's actions on March 29 as evidence of Defendants'

deliberate indifference.  He states that at 8:36 p.m. that evening Hibbard observed that Smetzer

was having trouble breathing and swallowing and recorded his observations in the jail activity

log.  Hibbard then waited, however, almost ninety minutes before calling Sheriff Newton, who

told Hibbard to contact a reserve officer to take Smetzer to the emergency room.  At 9:56 p.m.,

Keever transported Smetzer to the emergency room in the back of his police car.  Smetzer cites

this ninety-minute delay as evidence of the Defendants' deliberate indifference.

But in order to recover damages from an individual under § 1983, the plaintiff must

establish that the defendant "was personally responsible for the deprivation of a constitutional

right." *Knight*, 590 F.3d at 462-63.  Hibbard is not a Defendant in this case, and when Newton

29

learned of Smetzer's problems during his call from Hibbard (and perhaps from April, as discussed earlier), he immediately directed that Smetzer go to the emergency room.  Therefore, there is *no* evidence that Keever—or Newton, as Hibbard's supervisor—were aware of or condoned Hibbard's alleged delay in seeking medical attention on the night of March 29. *See id.* As a result, Smetzer's argument that this ninety-minute delay is evidence of Keever's and Newton's deliberate indifference is without merit.  Of course, this claim is also barred by the statute of limitations.

       6.  <u>That Smetzer Was Not Seen by a Doctor Within One-to-Two Days After the March 29 Emergency Room Visit</u>

Smetzer also cites Keever's failure to follow Dr. Coats's instructions to have Smetzer seen by a physician within one-to-two days after the March 29 emergency room visit. Smetzer's theory here rests on the argument that a prison official is deliberately indifferent if he intentionally interferes with a doctor's prescribed treatment. *See Zentmyer*, 220 F.3d 805 at 812.

Keever apparently claims he was unaware of Dr. Coats's directive, which may explain why he did not make a log entry on March 29 concerning a follow-up visit for Smetzer, and of course, he did not work at the Jail on March 30 or 31. (Keever Dep. 73-74.)  But there is no evidence that Keever *intentionally or maliciously* disregarded Dr. Coats's instruction. *Cf. Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (finding that a jury could infer from prison official's angry tone and hanging up the phone that his refusal to give inmate his medication was malicious).  And any notion of deliberate indifference is blunted by the fact that Keever apparently *did* schedule Smetzer to be seen by Dr. Haggenjos on Wednesday, April 2. Therefore, at most, Keever was negligent in failing to set an earlier appointment, but as

explained earlier, that is not enough to support an Eighth Amendment claim. *See Zentmyer*, 220 F.3d at 812; *Gutierrez*, 111 F.3d at 1375 ("[W]e must examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs.").

    7.  <u>That Smetzer Was Not Taken to the Emergency Room Until 6:45 p.m. on April 1</u>

At 5:45 a.m. on April 1, jailer Griffith observed Smetzer's swollen neck and Smetzer reported having trouble breathing.  Griffith then called Dr. Haggenjos, who advised him to keep an eye on Smetzer and if he was not better by 7:00 a.m. to bring him to the hospital; Griffith then called Sheriff Newton and relayed these events.  Although Griffith states that he checked back on Smetzer periodically and informed the next shift about Smetzer's condition, the record does not reveal the nature of his condition at 7:00 a.m., or whether he had actually improved.  Then, at 11:00 a.m., Newton (who knew of the 7:00 a.m. deadline) met with Smetzer (and thus was very much aware he was not in the hospital) and allegedly told him that he was "costing the County too much money" and that he would receive no more medical attention until he was transferred to the Department of Corrections. (Smetzer Dep. 144-45, 151; *see also* Slagle Dep. 31-33.)

Smetzer alleges that these events show that Newton was deliberately indifferent to his demonstrably serious condition because Newton failed to ensure that he was closely monitored or ultimately taken to the hospital—all contrary to Dr. Haggenjos's instructions.   He contends that it was obvious that his condition had not improved—something Newton could presumably see, at least if Smetzer is to be believed—and that Newton deliberately disregarded or countermanded Dr. Haggenjos's directive.

Indeed, as stated earlier, a prison official is deliberately indifferent if he intentionally

31

interferes with an inmate's prescribed treatment. *See Zentmyer*, 220 F.3d 805 at 812.  According to Smetzer, he was experiencing increased swelling and "excruciating pain" on April 1, 2008, and needed immediate medical attention, a scenario factually at odds with Newton's purported observations that morning and his representation that Smetzer claimed to be "doing okay." (*Compare* Smetzer Dep. 148, *with* Newton Dep. 70-72.)  It is undisputed, of course, that Smetzer's condition was indeed worse by that evening when he was hospitalized, so there is at least a reasonable inference that his condition was deteriorating and that he was not improved either by 7:00 a.m. or 11:00 a.m. *See McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 853 (7th Cir. 2010) (emphasizing  that all reasonable inferences must be drawn in the plaintiff's favor on a motion for summary judgment).

Simply put, a reasonable jury on this record could conclude that Smetzer's purported lack of improvement or continuing decline, together with Newton's purported statement about costing the County money and his disregard of a clear medical directive, all amount to deliberate indifference to Smetzer's serious medical need, and that the resulting delay—certainly after 11:00 a.m.—prolonged his suffering. *See, e.g.*, *Williams*, 491 F.3d at 716 (denying summary judgment where defendants' delay in seeking treatment caused prisoner six extra hours of pain and dangerously elevated his blood pressure); *Gil*, 381 F.3d at 662 (recognizing that "hours of needless suffering" can constitute compensable harm)  All of this is at least partially corroborated by Dr. Robinson, the emergency room physician, who treated Smetzer on the evening of April 1 and who testified that "time was of the essence" in that Smetzer had a "life-threatening infection" and needed surgical intervention to drain abscesses in his neck. (Robinson Dep. 49, 58, 88, 91 (explaining that more immediate treatment of Smetzer's life-threatening

condition would have been preferred).)

Accordingly, summary judgment must be denied with respect to Smetzer's Eighth Amendment claim against Sheriff Newton in his individual capacity for his conduct on April 1, 2008.

8.  <u>That Smetzer Was Taken to the Emergency Room on April 1 in Jailer Boyd's Car Rather Than by Ambulance</u>

Finally, Smetzer argues that jailer Boyd was deliberately indifferent to his serious medical needs on the evening of April 1 when he rejected the EMTs advice to have Smetzer transported to the hospital via ambulance and instead sent him in jailer Ledbetter's police car. But Boyd is not a Defendant in this case, and there is no evidence that Keever or Newton were aware of or condoned Boyd's decision to transport Smetzer by car. *See Knight*, 590 F.3d at 462-65 (stating that in an individual capacity § 1983 claim the plaintiff must establish that the defendant "was personally responsible for the deprivation of a constitutional right").  Rather, the record reflects that Sheriff Newton was not in when Boyd called him (Boyd Dep. 42-46; Newton Dep. 75), and that once Newton learned that Smetzer had gone to the hospital, he went there as well (Newton Dep. 76).  Therefore, this event is not evidence of Newton's or Keever's deliberate indifference.

In sum, not only are Smetzer's claims from conduct prior to March 30, 2008, barred by the statute of limitations, but they also fail on the merits.  As to the few occasions of purported deliberate indifference that are not time-barred, when viewed in a light most favorable to Smetzer, and drawing all reasonable inferences in his favor, only Sheriff Newton's actions on April 1, 2008, support an arguable claim of deliberate indifference.  With respect to that claim, a

genuine issue of material fact exists with respect to whether Newton had a "sufficiently culpable state of mind" when he purportedly delayed the provision of medical attention to Smetzer, *Holloway*, 2012 WL 5846289, at *7, and whether such delay "unnecessarily prolonged and exacerbated" Smetzer's pain or worsened his medical condition, *Grieveson v. Anderson*, 538 F.3d 763, 779-80 (7th Cir. 2008). *See, e.g.*, *Weeks*, 2012 WL 1669459, at *10 (denying summary judgment on plaintiff's individual capacity Eighth Amendment claims where a material issue of fact existed as to whether defendants' delay in treatment prolonged plaintiff's pain or worsened his dental condition).

## VI.  SHERIFF NEWTON IS NOT ENTITLED TO QUALIFIED IMMUNITY

"Government officials performing discretionary functions enjoy qualified immunity from suit to the extent that their conduct could reasonably have been thought consistent with the rights they are alleged to have violated." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006)) (citation and internal quotation marks omitted).  Therefore, summary judgment may still be appropriate in Sheriff Newton's favor if he is entitled to qualified immunity.

"Qualified immunity protects a defendant from liability as well as from the burden of standing trial." *Borello v. Allison*, 446 F.3d 742, 746 (7th Cir. 2006).  "In determining whether qualified immunity applies, this [C]ourt considers: (1) whether the plaintiff has asserted a violation of a federal constitutional right, and (2) whether the constitutional standards implicated were clearly established at the time in question." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999) (citation and internal quotation marks omitted); *accord Borello*, 446 F.3d at 746. "Although qualified immunity is a defense to a a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel*, 196 F.3d at 723.  "When the qualified

34

immunity inquiry cannot be disentangled from the disputed facts, the issue cannot be resolved without a trial." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540-41 (7th Cir. 2009).

Applying this standard here, qualified immunity does not shield Sheriff Newton from liability. As to the first prong of the test, the Court has already found a genuine issue of material fact concerning whether Newton intentionally denied or delayed Smetzer medical treatment on April 1 in violation of the Eighth Amendment, making summary judgment inappropriate. As for the second prong of the test, the general standard of liability under the Eighth Amendment for refusal to render medical care has been settled since *Estelle v. Gamble*, 429 U.S. 97 (1976). *See Walker v. Shansky*, 28 F.3d 666, 670 (7th Cir. 1994); *Doe v. Gustavus*, 294 F. Supp. 2d 1003, 1012 (E.D. Wis. 2003). It was also clearly established at the time of these events that such liability included the refusal to render dental care. *Board*, 394 F.3d at 484; *Wynn*, 251 F.3d at 593; *Weeks*, 2012 WL 1669459, at *13-14; *McCue v. Aldridge*, No. 3:05-cv-554, 2007 WL 2570380, at *23 (S.D. Ill. Sept. 4, 2007) ("[I]t cannot be said that the right to adequate medical and dental care was not clearly established in the year 2004.").

Therefore, because the law here was clearly established, Sheriff Newton cannot avail himself of the qualified immunity defense against Smetzer's alleged violations of the Eighth Amendment. *Walker*, 28 F.3d at 670.

## VII.  SMETZER'S OFFICIAL CAPACITY CLAIM AGAINST SHERIFF NEWTON DOES NOT SURVIVE SUMMARY JUDGMENT

Smetzer's claim against Sheriff Newton in his official capacity is that he had no written policy that told the jailers what they should do if faced with an inmate's dental or medical emergency; and, so the theory goes, since there was no policy, there was also no jailer training on one.

But this assertion is undercut by Smetzer's recognition that there was an unwritten policy or practice in the Jay County Jail that all inmate medical or dental requests were to be submitted in writing and then faxed by the Jail to the applicable health care provider for review. (Mem. in Opp'n 17-18; Newton Dep. 35-37.)  And if the inmate's medical or dental need appeared more immediate, the jailer would call the Jail's doctor or dentist, and if that provider deemed that the inmate needed to be seen, the Jail would promptly transport the inmate to the provider's office or to the emergency room.  Indeed, this is what occurred with Smetzer, except perhaps, on the morning of April 1, 2008.

Smetzer, however, criticizes what he considers an *ad hoc* system of inmate health care because the Sheriff had made no provision for the presence of State licensed health care professionals at the Jail to monitor the inmates, assess their condition, and provide treatment to them. (Mem. in Opp'n 18.)  Overall, he argues that it would have been far better if Newton would have followed Indiana's Jail Standards.[12]

 In short, Smetzer is advancing a claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), which stands for the proposition that municipalities are not vicariously liable for the constitutional violations of their employees under § 1983 unless those acts were carried out pursuant to an official custom or policy. *Id.* at 694; *Grieveson*, 538 F.3d at 771.  And even then, the plaintiff must show that the municipal policy or custom was the "direct

---

[12] Smetzer does not go into detail concerning the Indiana Jail Standards, and it also does not appear that he is contending that they provide him with a cause of action.  This is a wise omission since every federal court that has considered the matter has determined that they do not give rise to an implied cause of action under Indiana law. *See Olson v. Brown*, No. 4:09-cv-6, 2012 WL 3044275 at *7-9 (N.D. Ind., July 25. 2012) (collecting cases).  Moreover, as noted earlier, Smetzer never filed a Tort Claim Notice, so any state law claims, such as this would be, fail at the outset.  Finally, the Constitution, not Indiana's Jail Standards, establish the standard by which his claims under § 1983 must be assessed. *Zimmerman v. Hoard*, 5 F. Supp. 2d 633, 637 (N.D. Ind. 1998); *see also Wells v. Bureau Cnty.*, 723 F. Supp. 2d 1061, 1083 (C.D. Ill. 2010) (observing that § 1983 provides no remedy for failure to meet Illinois' Jail Standards).

cause" or "moving force" behind the constitutional violation. *Monell*, 436 U.S. at 694;

*Grieveson*, 538 F.3d at 771; *Holmes v. Sheahan*, 930 F.2d 1196, 1200 (7th Cir. 1991); *see also*

*Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530-531 (7th Cir. 2000).

 "That a constitutional injury was caused by a municipality may be shown directly by

demonstrating that the policy itself is unconstitutional" or "indirectly 'by showing a series of bad

acts and inviting the court to infer from them that the policymaking level of government was

bound to have noticed what was going on and by failing to do anything must have encouraged or

at least condoned, thus in either event adopting, the misconduct of subordinate officers.'"

*Novack*, 226 F. 3d at 531 (quoting *Jackson v. Marion Cnty.*, 66 F.3d 151, 152 (7th Cir. 1995));

*see Reid v. Rovenstine*, No. 3:05-CV-126 RM, 2007 WL 952007, at *6 (N.D. Ind. Mar. 26,

2007).  Deliberate indifference to a detainee's medical needs can also be proven by showing

"there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures

that the inmate population is effectively denied access to adequate medical care." *Holmes,* 930

F.2d at 1200.

 At the outset, it does not appear that Smetzer is asserting that Newton's unwritten policy

for handling inmate medical requests—directly faxing them from the Jail to the health care

provider for assessment—explicitly violates a constitutional right. *Calhoun v. Ramsey*, 408 F.3d

375, 379 (7th Cir. 2005); *Lowe v. Sheahan*, No. 94 C 7054, 1995 WL 603174, at *5 (N.D. Ill.

Oct. 10, 1995) (explaining that "the written request for medical  treatment policy does not

amount to a constitutional claim").  But even if that argument were to be made, it would have no

force since similar policies have been upheld. *See Miller v. Hart*, No. 1:08-CV-118, 2009 WL

3872048 at *6 (citing *Graham v. Cnty. of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) (finding

that it is not unconstitutional for municipalities and their employees to rely on the medical

judgments made by medical professionals, responsible for prisoner care)).  And in at least three

instances where it appeared that Smetzer needed immediate medical intervention, the Jail called

either the doctor or the dentist for direct consultation or took him directly to the emergency

room.  As this Court has previously observed, where there was an unwritten policy of officers

contacting a physician or nurse, or taking the detainee to the emergency room for serious

medical conditions, the lack of a more specific policy on how to treat and observe inmates . . .

cannot be deemed tantamount to a 'systemic and gross' deficiency, which renders the policies

constitutionally inadequate. *Reid*, 2007 WL 952007, at *7 (citing *Bradich ex. rel. Estate of

Bradich v. City of Chicago*, 413 F.3d 688, 690 (7th Cir. 2005)).  Indeed, if Smetzer was deprived

of medical or dental care, it "resulted from factors other than a faulty [jail practice]." *City of

Canton v. Harris*, 489 U.S. 378, 390-91 (1989) (citations omitted).

     Another way of complaining about an express policy—and the method Smetzer is

apparently employing—is to object to omissions in the jail's unwritten policy.[13] *Calhoun*, 408

F.3d at 380.  In particular, Smetzer seems to assert that the Jail should have a policy or practice

whereby all inmate medical and dental treatment requests are reviewed by "licensed and certified

health care providers at the facility" and that such important treatment judgments should not be

left to the discretion of non-medical jail personnel.[14] (Mem. in Opp'n 19.)  This seems to raise

two issues: first, whether such an implicit policy existed in the jail—that jailers were to perform

---

[13]  The Jail did have express policies pertaining to inmate injury or death, medical records, staff
development and training, and Jail operations, but these policies did not specifically address dental or medical
emergencies.

[14] The Indiana Jail Standards, which Smetzer frequently mentions, do not seem to require such on-site
staffing. *See* 210 IND. ADMIN. CODE § 3-1-11.

a sort of front-line medical triage on inmate requests—and second, whether they were trained to do so.

Laying aside the question of whether such a policy is unconstitutional, in either instance, as the Seventh Circuit has recognized, Smetzer needs to show that the alleged deprivation was not a random or isolated incident. *Calhoun,* 408 F.3d at 380.  That is, "[t]o prove that a constitutional violation has occurred due to a failure to make a policy, the plaintiff must come forward with evidence not only of the particular case but with evidence of a 'pattern or series of incidents of unconstitutional conduct or a clear constitutional duty to take action because the situation was certain to recur.'" *Terry v. Rice,* No. IP 00-0600-C H/K, 2003 WL 1921818, at *20 (S.D. Ind. Apr. 18, 2003) (quoting *Harris v. City of Marion,* 79 F.3d 56, 58-59 (7th Cir. 1996)); *see also City of Canton,* 489 U.S. at 389.

But Smetzer only cites to alleged "occasions" of conduct that he personally experienced during his March and April 2008 dental condition.  This runs counter to any suggestion that there were widespread, repeated failures by the Jail to competently handle dental and medical emergencies. *See Grieveson,*  538 F.3d at 774 (holding that four instances of defendant's conduct pertaining to the dispensing of medications that the inmate personally experienced, standing alone, were insufficient to establish a widespread unconstitutional practice by the defendant); *Wells,* 723 F. Supp. 2d at 1085-86 (finding that several instances of inmate suicide were insufficient to show a pattern of suicide from which the inference could be drawn that defendant was aware its policies were inadequate and chose to do nothing about it).

Moreover, Smetzer does not show that the Jail's failure to adopt an express medical or dental emergency policy along the lines he suggests was the "proximate cause of or moving

force behind" his alleged constitutional injury. *Pittman ex rel. Hamilton v. Cnty of Madison*, No. 08-0890-DRH, 2011 WL 4499919, at *9 (S.D. Ill. Sept. 27, 2011) (citations omitted); *see Sams v. City of Milwaukee*, 117 F.3d 991, 994 (7th Cir. 1997).

And to the extent that Smetzer challenges the constitutionality of a practice granting non-medical jail personnel, once adequately trained, with discretion to determine whether emergency medical care is needed, that too is unpersuasive. Again, other courts have already rejected similar arguments. *See, e.g.*, *City of Canton,* 489 U.S. at 387 (stating that there "can be little doubt" that a jail's policy to take an inmate who needs medical care to a hospital for medical treatment is constitutional on its face); *Wallace v. Hounshel*, No. 1:06-cv-1560, 2009 WL 734714, at *10 (S.D. Ind. Mar. 19, 2009) (rejecting inmate's claim that his constitutional rights were infringed "simply because a policy gives non-medical jail personnel discretion to determine whether medical care was needed in a given situation"); *Young v. Ballis*, 762 F. Supp. 823, 830-31 (S.D. Ind. 1990) (rejecting inmate's claim of inadequate on-site medical care where a physician was on-call and a nurse visited three times a week).

This brings the Court to what seems to be Smetzer's remaining assertion—that the deprivation he suffered arose from Sheriff Newton's failure to train the jailers in how to determine when emergency medical care is needed. "Failure to train is a species of deliberate indifference." *Miller*, 2009 WL 3872048, at *6 (citation omitted); *see City of Canton*, 489 U.S. at 388. Liability may attach "if persuasive evidence is presented of a training policy or custom, or lack thereof, which reflects a showing of deliberate indifference on the part of a municipality to the constitutional rights of its inhabitants." *Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (citing *City of Canton*, 489 U.S. at 389-92); *see also Erwin v. Cnty. of Manitowoc*, 872

40

F.2d 1292, 1297-1298 (7th Cir. 1989) ("The inadequacy of police training serves as a § 1983

liability basis only if the failure to train amounts to 'deliberate indifference' to the rights of

persons with whom the police deal.").

The record reflects that Dr. Haggenjos trained the jailers in first aid, taking vital signs,

medical screening and symptom recognition, and the dispensing of medicines.  Full-time jailers

also completed the Indiana Law Enforcement Academy's prescribed course for jail officers.

Smetzer offers nothing more than mere conclusory assertions that this training was deficient. *See*

*Gee v. Sharp*, No. 1:06-cv-94, 2009 WL 899655, at *12 (S.D. Ind. Mar. 31, 2009) (rejecting

claim that jailers were inadequately trained to address an inmate's medical needs where the

jailers completed in-house training as well as an Indiana Law Enforcement Academy course).  In

any event, "a single incident is generally not enough to establish a failure to train." *Miller*, 2009

WL 3872048, at *7 (citing *City of Canton*, 489 U.S. at 390–391); *see also Novack*, 226 F.3d at

531.  "This legal proposition stands as a consequence of the need to show that the deficiency in

training, as it relates to the facts here, actually caused the jail . . . staff's indifference to

[Smetzer's] dental needs." *Miller*, 2009 WL 3872048, at *7 (citing *City of Canton*, 489 U.S. at

391).

Moreover, on this record, there is no evidence that any Jail inmate prior to Smetzer

sustained serious injury from a failure to secure proper medical or dental attention. *See Gee*,

2009 WL 899655, at *12 (citing *Hirsch v. Burke*, 40 F.3d 900 (7th Cir. 1994)).  Thus, there is no

evidence that the Sheriff was on notice of any pattern of similar violations resulting from

inadequate training in recognizing the symptoms of dental complications such as Ludwig's

angina. *See id.* (citing *Hirsch*, 40 F.3d at 904-05).  This notice of violations would have to show

41

that "the failure to provide further training was tantamount to a deliberate or conscious decision" by the Sheriff to allow the violations. *Hirsch*, 40 F.3d at 904.

In sum, Smetzer fails to produce evidence upon which a reasonable jury could infer that either Newton's unwritten emergency medical and dental policy or the training of the jailers was the "proximate cause of or moving force behind" his alleged constitutional injury. *Wells*, 723 F. Supp. 2d at 1085-86. This dooms his official capacity claim. *See id.*; *Sams*, 117 F.3d at 994; *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993); *City of Canton*, 489 U.S. at 389; *Bailey v. Himelick*, No. 1:09-cv-219, 2012 WL 333459, at *5 (N.D. Ind. Feb. 1, 2012). On this record, a reasonable jury could only conclude that the alleged failure to meet Smetzer's medical needs was "nothing more than an isolated incident." *Miller*, 2009 WL 3872048, at* 7 (citing *City of Canton*, 489 U.S. at 391 (articulating that there can be no municipal liability where "an otherwise sound program has occasionally been negligently administered")). Accordingly, Smetzer's official capacity claim cannot survive summary judgment.[15]

## VIII.  CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (Docket # 88) is GRANTED IN PART and DENIED IN PART. The motion will be GRANTED with respect

---

[15] Smetzer did not respond to Defendants' argument that the state law claims against Sheriff Newton and Sergeant Keever should be dismissed under Indiana Code § 34-13-3-5(b), which provides that a lawsuit alleging that an employee acted within the course of his employment works as a bar to an action by the claimant against that employee personally. *See Bushong v. Williamson*, 790 N.E.2d 467, 472 (Ind. 2003) (stating that the Indiana Tort Claims Act provides immunity to governmental employees acting within the scope of their employment). The Court essentially reserved this issue in its August 13, 2010, Opinion and Order, to give Smetzer an opportunity at this stage of the proceedings to show that Newton and Keever acted outside the scope of their employment. *See Smetzer v. Newton*, No. 1:10-cv-93, 2010 WL 3219135, at *9 (N.D. Ind. Aug. 13, 2010). He has chosen to not do so. Accordingly, Smetzer has abandoned any state law claims against the individual Defendants. *See Caruso*, 197 F.3d at 1197; *Arendt*, 99 F.3d at 237. The claims against the Sheriff's Department under state law were previously dismissed. *See Smetzer*, 2010 WL 3219135, at *9.

to all claims other than Smetzer's Eighth Amendment claim against Sheriff Newton in his individual capacity stemming from his conduct on April 1, 2008, which must go forward to trial.

SO ORDERED.

Enter for the 21st day of December, 2012.

S/ Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge